STATE OF MAINE                                    SUPERIOR COURT
ANDROSCOGGIN, SS                                  DOCKET NO. CR 05-1019


STATE OF MAINE,
                                                  ORDER ON DEFENDANT'S
                Plaintiff,                        MOTION FOR A NEW TRIAL

v.

DANIEL ROBERTS,                                   JUN 14 '21 AM 10:24
                                                  ANDRO SUPERIOR COURT

                Defendant


On February 27, 2007 Petitioner, Daniel Roberts, was convicted of murder and sentenced

to 55-years in prison. Roberts now requests in his second motion for a new trial pursuant to 15

M.R.S. § 2138, his due process rights under the Fifth and Fourteenth Amendments, and the Maine

Constitution. Roberts' main argument pertains to the advancements in DNA science and analysis

in the intervening-years since his conviction. Specifically, Roberts argues new DNA technology

shows that the State's main argument—that the victim could be definitively excluded as a source

of DNA on the chrome .38 caliber Smith and Wesson revolver found at the crime scene—was

incorrect and unfairly swayed the jury.

I.      **Facts:**

Roberts and the victim—Melissa Mendoza—had previously been in a relationship and had

a daughter together named Savanna. The relationship was contentious to say the least. In July of

2005, a court awarded Roberts primary custody of Savanna. Going against the court's mandate,

Mendoza traveled to California with Savanna without seeking modification of the order and

without telling Roberts. After some effort, Roberts located Mendoza and traveled to California to

bring Savanna back to Maine after Savanna was turned over to the Stockton Police Department.

1

In response to Mendoza's unapproved trip to California, Roberts sought to limit Mendoza's contact with Savanna to supervised visits. The District Court granted this request.

On Friday August 12, 2005 Mendoza had a supervised visit with Savanna at Roberts' home. The visit—for which Roberts was not present—was supervised by a woman named Stacey Robitaille.[1] According to witnesses, Mendoza was not happy that the visit needed to be supervised or that Robitaille was sleeping in Roberts' bedroom. When Roberts returned home he claims that a few items were missing—including the handgun that was found next to Mendoza when she was killed—and that Mendoza had defaced a photo of Roberts and Savanna. After her visit ended, Mendoza checked into a hotel in Auburn. According to Robitaille, Mendoza began making harassing phone calls to Roberts' home and cellular phones starting at about 6:00 p.m. on August 14th. Multiple witnesses describe her as erratic and angry while slurring her words.[2] Mendoza even said to one witness that she, "hate[d] Danny. I hope he dies. I could kill him." (Pet. Mot. for New Trial at 6). Finally, Roberts agreed to speak with Mendoza and at approximately 1:17 a.m. on August 15, 2005, Mendoza pulled into Roberts' driveway. Less than five minutes later, Roberts shot Mendoza in the back of the head in his garage.

Roberts argues that he was acting in self-defense. Roberts claims that he had placed a gun in his back pocket because of Mendoza's previous threats to kill him. As Roberts tells it, Mendoza walked into the garage with Roberts' missing chrome .38 in hand. After asking Mendoza what she was doing she allegedly replied, "Dan, I'm going to kill you and I'm going to kill the baby." *Id.* at 8. Mendoza then turned her back to Roberts who then shot and killed Mendoza instantly.

---

[1] Robitalle had frequently baby-sat Savanna and was in the process of obtaining her degree in Early Childhood Psychology from the University of Maine at Farmington.

[2] At the time of her death, Mendoza's blood alcohol level was .15 and she tested positive for Diazepam, which indicated she had been taking Valium. (Pet. Mot. for New Trial at 7).

The State argues the events happened a bit differently. The State claims that Roberts knew Mendoza would enter through the unlit garage; lied in wait; shot Mendoza in the back of the head; and then planted the chrome .38 revolver next to Mendoza's body.

The State filed a motion to dismiss which the court herein denies and proceeds to analyze Robert's motion for a new trial. The court based its denial on the failure of petitioner to file his notice in less than 2-years before he filed his motion on June 24, 2019 and failure to show that DNA improvements became available less than 2-years before he filed his motion.

## II.  Legal Standard for New Trial Under 15 M.R.S.A § 2138

"To obtain a new trial based on newly discovered DNA evidence obtained through a post judgment motion for DNA analysis, a defendant must establish by clear and convincing evidence one of three statutorily identified reasons for the granting of a new trial." *State v. Reese*, 2013 ME 10, ¶ 23, 60 A.3d 1277. The first two subsections under 15 M.R.S. § 2138 require a prerequisite showing that only the perpetrator of the crime could have been the source of the DNA. In full, 15 M.R.S. § 2138(10) provides:

> If the results of the DNA testing under this section show that the person is not the source of the evidence, the person authorized in section 2137 must show by clear and convincing evidence that:
> A. Only the perpetrator of the crime or crimes for which the person was convicted could be the source of the evidence, and that the DNA test results, when considered with all the other evidence in the case, old and new, admitted in the hearing conducted under this section on behalf of the person show that the person is actually innocent. If the court finds that the person authorized in section 2137 has met the evidentiary burden of this paragraph, the court shall grant a new trial;
> B. Only the perpetrator of the crime or crimes for which the person was convicted could be the source of the evidence, and that the DNA test results, when considered with all the other evidence in the case, old and new, admitted in the hearing conducted under this section on behalf of the person would make it probable that a different verdict would result upon a new trial; or
> C. All of the prerequisites for obtaining a new trial based on newly discovered evidence are met as follows:
>    1) The DNA test results, when considered with all the other evidence in the case, old and new, admitted in the hearing conducted under this section on

3

behalf of the person would make it probable that a different verdict would result upon a new trial;

2) The proffered DNA test results have been discovered by the person since the trial;

3) The proffered DNA test results could not have been obtained by the person prior to trial by the exercise of due diligence;

4) The DNA test results and other evidence admitted at the hearing conducted under this section on behalf of the person are material to the issue as to who is responsible for the crime for which the person was convicted; and

5) The DNA test results and other evidence admitted at the hearing conducted under this section on behalf of the person are not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict.

15 M.R.S. § 2138(10).

## III. DNA Evidence:

### 1. DNA Testing in 2005

According to Petitioner's expert witness, Karl Reich, Ph.D.,[3] the general process for obtaining a DNA profile has not changed since the 2005 trial. (Aff. of Karl Reich at 2). The steps of the general process are as follows: 1) Sample Collection; 2) DNA Extraction; 3) DNA Purification; 4) DNA Quantification; 5) Amplification; 6) Analysis; and 7) Computer Analysis. *Id.* at 2-3. Reich notes that although the general process remains the same as it was in 2005, there have been improvements in every step of the process except DNA Extraction. *Id.* at 3-4.

The Maine State Police Crime Laboratory's findings from 2005 are as follows:

a. *Item 1B (Swab of butt of RG40 Revolver):*

Daniel Roberts' DNA was present on the RG40 Revolver. "The estimated probability of selecting an unrelated individual at random from the FBI Caucasian population having a DNA

---

[3] Karl Reich has a doctorate in Molecular Biology and currently serves as the Chief Scientific Officer of Independent Forensics of Illinois. His extensive and impressive resume is attached to his affidavit.

4

profile matching Daniel Roberts's four locus DNA profile . . . is 1 in 269 thousand." Roberts does not deny having held and used the RG40 Revolver on the night of Mendoza's death.

b. *Item 1C (Swab of trigger of RG40 Revolver):*

Only a one locus DNA profile was obtained from this part of the RG40 from which Roberts could not be excluded as a donor to the profile.

c. *Item 2C (Swab of red brown deposit from left side of Smith and Wesson Revolver):*

No DNA was obtained.

d. *Item 2B (Swab of textured area on rubber grip of the Smith and Wesson Revolver):*

Daniel Roberts' DNA was confirmed at 10 loci. "The estimated probability of selecting an unrelated individual at random from the FBI Caucasian population having a DNA profile matching Daniel Roberts' ten locus DNA profile . . . is 1 in 69.0 billion." Further, there was a minor DNA profile present on the gun that did not match Mendoza.[4]

e. *Item 2C (Swab of trigger of the Smith and Wesson Revolver):*

No DNA profile was obtained but male DNA was confirmed.

2. DNA Testing in 2018

In his affidavit, Dr. Reich outlines how DNA has improved in the past thirteen years. *Id.* at 4-6. Overall, Dr. Reich opines that "improvements in the methods, procedures, reagents and instrumentation . . . have increased the sensitivity of the method such that it is now realistic to propose obtaining probative DNA profiles from touched and handled items even down to single

---

4 This seems odd to the court: Roberts contends that Mendoza stole the gun about a week earlier—which means she was handling the gun for a week before it was discovered at the crime scene—and yet her DNA was not proven to be on the gun while his DNA was present at 10 loci? If Mendoza had been handling the gun for a week prior to the shooting, isn't it more likely that her DNA would be more prevalent and his less-so?

fingerprints, which are arguably the smallest single source evidentiary items." *Id.* at 7. "DNA testing has made significant strides in regard to the quality of DNA testing available including, but not limited to, the sensitivity of the DNA amplification kits and an increased number of loci included in the kits." (Sorenson Forensics: Forensic Case Review).

### 3. New DNA Conclusions

The Petitioner admits that the "new results are inconclusive, and do not definitively establish that Mendoza was a contributor [of DNA on the Smith and Wesson Revolver]" but maintains that "the testimony [at trial] that she could not have been a contributor severely prejudiced Roberts, where it allowed the State to argue that Roberts claim that Mendoza came into the house armed with his gun was a complete sham, and that the physical evidence directly contradicted his version of events, undermining Roberts' self-defense claim and his credibility." (Pet. Mot. for New Trial at 12).

Petitioner employed Sorenson Laboratories to review the DNA evidence from the trial, and to run their own tests on the evidence. *Id.* at 4. Sorenson Forensics came to two relevant conclusions. The first pertains to the swab of red brown deposit from the left side of the Smith and Wesson revolver. In 2005, the Maine State Police Crime Laboratory determined that Mendoza could be excluded as a donor on this item. According to Sorenson, however, "because more information was obtained in the recent testing, the minor is now inconclusive and no longer suitable for comparison. Therefore, no reference, including that of the victim, can be compared to the minor." (Sorenson Forensics: Forensic Case Review). The second relevant conclusion pertains to the swab of the trigger of the Smith and Wesson revolver. In this case, no DNA profile was obtained in 2005. In 2018, Sorenson "yielded a mixture of at least two contributors, at least one of which is male." (Sorenson Forensics: Forensic Case Review). When boiled down,

6

in regard to this sample Sorenson came to the conclusion that "the new data that was obtained for this item confirms that only one of the minimum of two contributors can be confirmed as male. Since this mixture was deemed inconclusive, no comparisons can be made to it—*meaning no inclusions or exclusions can be made for any potential donor.*" (Sorenson Forensics: Forensic Case Review) (emphasis added).

## IV.  Discussion

### 1.  15 M.R.S. § 2138(10)(A) and (B)

As mentioned above, in order to obtain a new trial under either of these two subsections, the petitioner must first show that *only* the perpetrator of the crime could be the source of the DNA evidence. Because both of these subsections require the same prerequisite showing, it makes sense to decide whether or not this showing is present before analyzing any further.

To be direct: it will be very difficult for Petitioner to make this initial showing. In short, it will be difficult to make this showing for the simple fact that there are two unknown sources of DNA on the revolver. The Petitioner argues that one source comes from the first responder that moved the gun while attending to Mendoza; and the other is Mendoza's. How can the court reason that the one sample of DNA *could only* come from the perpetrator of the crime, while Petitioner himself argues that someone other than the perpetrator of the crime left DNA of a similar kind on the gun? This may be a different story if Mendoza's DNA was definitively on the gun. But that is not the case. We are presented with two unidentified sources of DNA on the gun, and Petitioner wants this court to take his theory of the case as truth and blindly land at the

7

decision that, because the new DNA evidence shows that Mendoza could not be excluded as a source of DNA, that could only mean that Mendoza walked into the garage with the revolver in hand with the intent to kill. Taken with all of the record evidence at the court's disposal; it would be improper to determine that *only the perpetrator* of the crime could be the source of the DNA on the revolver.

## 2. 15 M.R.S. § 2138(10)(C)

15 M.R.S. § 2138(10)(C) "calls for a new trial if, among other requirements, the newly discovered evidence would make it probable that a different verdict would result upon a new trial." *Reese*, 2013 ME at ¶ 30.

Petitioner argues that this new evidence—the fact that Mendoza cannot be excluded as a possible source of the DNA on the revolver—undermines the State's argument at trial that Roberts' theory of self-defense must be a sham because Mendoza could be excluded from the pool of people who could have left DNA on the chrome Smith and Wesson revolver. According to Petitioner, "[t]he State relied heavily on the fact that Mendoza was purportedly excluded as one of the DNA contributors on the butt and trigger of the .38 caliber revolver. The State used the expert's testimony to argue that Roberts' 'claim of self-defense is a made-up, manufactured, contrived, fabricated, and invented story that has no basis in fact, the evidence or common sense.'" (Pet. Mot. for New Trial at 17). The court agrees, to an extent, with Petitioner that the State's case would have been diminished if the State could not have presented an expert witness who was willing to testify that Mendoza could be definitively excluded as a source of DNA on the .38 caliber revolver. Hearing an expert state "facts" about forensic evidence is powerful and

8

could certainly sway a jury. The court's job under this statutory provision is to decide whether or not it is probable that a different outcome would result if the jury had not heard this testimony.

The Petitioner further argues that had the jury been able to hear that Mendoza could not have been excluded as a possible DNA source, this would have been "powerful evidence" and would have "eviscerated the State's entire argument that the jury could definitively find Mendoza did not touch the firearm because her DNA was not recovered." *Id.* However, Petitioner overstates the value of the new evidence. The court must find that it is *probable* that a different verdict would result upon a new trial. Even if we accept the conclusions of the newly tested DNA as true, petitioner still falls short. At best this evidence proves merely that Mendoza *could have* touched the gun. The conclusions go no further. There is no evidence to show that Mendoza was in fact the person who touched the gun; she touched it before she was killed; she intended—or even threatened—to kill Roberts or Savanna; or that the jury would have been persuaded in the slightest by this evidence.

Further, Petitioner attempts to distinguish this case from two Law Court decisions that ruled "that the defendants did not make an adequate showing that the new DNA evidence excluding them from evidence found at or near the scene would not have made a difference at trial, this was because the defendants were unable to demonstrate that the newfound DNA evidence was related to the 'real' perpetrator, or the homicide itself." (Pet. Mot. for New Trial at 18) (citing *State v. Bates*, 177 A.3d 621, 626 (ME 2018); *State v. Dechaine*, 121 A.3d 76 (ME 2015)). The Petitioner's reliance on these cases is confounding. Petitioner attempts to argue that DNA on a gun that was found at the crime scene—which may or may not have come from the

9

victim—is of a different kind than DNA found under a victim's fingernails, as in *Dechaine*.[5] In this case, similar to *Dechaine*, we are presented with unidentified DNA left at the scene of the crime. This DNA evidence, however, is even less helpful to the Petitioner than the DNA in *Dechaine*. In *Dechaine*, the convicted could be *conclusively* excluded as a donor of the DNA found under the victim's fingernail, and yet, the Law Court concluded that when all of the evidence was taken as a whole the petitioner could not make a claim under §2138(10)(C). Here, Petitioner has not conclusively shown that Mendoza ever even touched the .38 caliber revolver— a gun he maintains she was in possession of for nearly a week prior to her death. The court's skepticism about this point is referenced in footnote 4 above: Roberts claims that Mendoza stole the gun a week before her death and he did not touch the gun on the night of the murder. If that were the case, it seems implausible to the court that his DNA[6] would be identifiable on the gun and Mendoza's would not be. Therefore, the court concludes that it cannot say that Roberts has met the standard under this subsection to the extent necessary to merit a new trial.

## V.   **Conclusion**

In conclusion, Petitioner's request for a new trial based on the assertions that "the testimony at trial was not accurate; the butt of the firearm had a mixture of three contributors, and Mendoza cannot be excluded from the two minor contributors; and the trigger had a mixture of two contributors, and Mendoza cannot be excluded from the sample." (Pet. Mot. for New Trial at 2). Further, Petitioner claims that "[t]he new testing—which reveals a mixture of three

---

[5] In *Dechaine*, the defendant was convicted of kidnapping, sexually assaulting, and murdering a twelve-year-old girl. The Law Court determined that "the court was justified in finding that there was no evidence that [the victim] had struggled with her killer, meaning that it was entirely possible that the small amount of unidentified male DNA on her thumbnail was left there before her death by a person and in a manner altogether unrelated to her murder." *Dechaine*, 121 A.3d at 95.

[6] Which was "touch DNA." (*See* Sorenson Forensics: Forensic Case Review).

profiles on the butt of the firearm—*corroborates* what Roberts has maintained from the outset: that he touched the gun at some point given that he owned it, that Mendoza entered the home armed with the firearm, and that the first responding officer moved the firearm prior to the arrival of the paramedics and police photographer." *Id.* (emphasis added). The Oxford English dictionary defines "corroborate" as a verb that "confirm[s] or give[s] support to (a statement, theory, or finding)." The court cannot say that this new testing in anyway confirms or even gives support to the Petitioner's theory. At most, the court can only say that it does not rule out what the Petitioner claims. This, however, is not enough to make it probable that a different verdict would result upon a new trial. Therefore, the court denies Petitioner's second motion for a new trial.

The entry is: The Petitioner's Motion for a New Trial is hereby DENIED.

Pursuant to M.R.Civ.P. 79(a) the Clerk is hereby directed to incorporate this Order by reference in the docket.

Date: 06/14/2021

Joyce A. Wheeler
Active Retired Justice
Maine Superior Court

11