MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2024 ME 51
Docket:        Cum-23-4
Argued:        April 10, 2024
Decided:       July 9, 2024

Panel:         STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

ERNEST B. WEIDUL

v.

STATE OF MAINE

HORTON, J.

[¶1]    Ernest B. Weidul appeals from a judgment entered by the post-conviction court (Cumberland County, *Anderson, J.*) denying his petition for post-conviction relief after a three-day hearing.  Weidul, who had been convicted of manslaughter and other charges, alleged in his petition that he had received ineffective assistance of counsel.  The justice (*Wheeler, J.*) who presided at Weidul's trial and during the first two days of the post-conviction hearing retired before the post-conviction hearing was completed, and a different justice (*Anderson, J.)* presided during the third day of hearing and rendered a judgment denying the petition.  As one ground for his appeal, Weidul argues that the judgment should be vacated because the justice who rendered it did not observe the testimony of the witnesses who testified during the first

two days of the hearing and did not permit Weidul to recall those witnesses except for questioning on areas not covered previously. The second justice was ultimately responsible for factfinding, and the credibility of the witnesses' testimony during the first two days of hearing was both disputed and essential to the outcome. Because there is no provision in our rules of procedure authorizing a justice who did not preside during disputed live testimony during a post-conviction hearing to adjudicate the credibility of the testimony over objection, and because the error was not harmless, we agree with Weidul, vacate the judgment, and remand for additional proceedings.

## I. BACKGROUND

[¶2] In 2012, the trial court (*Wheeler, J.*) entered a judgment of conviction against Weidul after a jury found him guilty of manslaughter (Class A), 17-A M.R.S. § 203(1)(A) (2024); aggravated assault (Class B), 17-A M.R.S. § 208(1)(A) (2010);[1] and operating while his license was suspended or revoked (Class E), 29-A M.R.S. § 2412-A(1-A)(A) (2024). The evidence presented at that trial, viewed in the light most favorable to the State, established the following facts beyond a reasonable doubt. *See State v. Marquis*,

---

[1] This statute was amended after the date of the crime at issue here. *See* P.L. 2015, ch. 358, § 1 (effective Oct. 15, 2015) (codified at 17-A M.R.S. § 208(1)(A) (2024)).

2023 ME 16, ¶ 19, 290 A.3d 96; *State v. Weidul*, Mem-13-69 (June 20, 2013) (affirming the judgment of conviction).

[¶3]  On May 5, 2010, Weidul and the victim met when Weidul's vehicle collided with an object outside of the victim's Portland apartment, and the victim invited Weidul in for a drink.  Weidul and the victim became intoxicated. They got into a fight, resulting in significant, bloody facial injuries to the victim. The victim called for emergency assistance the next day and was transported to Mercy Hospital.  He died in the hospital on May 7, 2010.

[¶4]  After the victim's death, the police returned to the victim's apartment, where they found blood spatter on the wall behind the victim's couch, blood on the couch cushions, an uprooted clump of long hair, a blood transfer stain on the victim's pillow in the bedroom, a blood-soaked shirt that was too small for the victim in the bathroom, and a hospital bracelet with Weidul's name on it.  On May 8, 2010, an officer who had been alerted to look for Weidul's vehicle saw Weidul's vehicle and noticed that it did not have functioning taillights.  The officer stopped the vehicle, which Weidul was driving, and learned that Weidul's license was under suspension.  The officer, through police dispatch, informed the detectives investigating the victim's death that he had located Weidul; he then engaged Weidul in small talk until

the detectives arrived at the scene about an hour later. The police arrested Weidul for operating a motor vehicle with a suspended license.

[¶5]  At the police station, after reading *Miranda* warnings to Weidul, police questioned Weidul regarding his interaction with the victim, and Weidul admitted to punching the victim in the face multiple times. Weidul also provided the police with a DNA sample and complied with their requests to collect other evidence.

[¶6]  The State charged Weidul with aggravated assault and operating while his license was suspended or revoked, and later filed a superseding indictment that added a manslaughter charge. Weidul was assigned a total of five court-appointed defense attorneys from the initiation of the charges through the end of his trial. In September 2011, the court appointed the third of these attorneys to replace withdrawn counsel. Because of the substantial amount of work needed to prepare the case for trial, the attorney moved to have an additional attorney appointed as co-counsel in November 2011, and the court granted the motion, appointing the fourth attorney to represent Weidul in the criminal matter. On December 1, 2011, Weidul's counsel filed a motion to suppress Weidul's statements to police on the ground that he did not waive his right to remain silent and did not make the statements voluntarily. The

court scheduled a jury trial to begin on January 27, 2012.

[¶7]   After a breakdown of the attorney-client relationship between Weidul and his new counsel, his two attorneys moved to withdraw from Weidul's defense on January 6, 2012.  With just a few weeks before Weidul's jury trial was scheduled to begin, the court denied the motion the same day, noting the attorneys' professional approach to the case and the difficulty of finding counsel for Weidul after he had "gone through a number of counsel, burning bridges."

[¶8]  The court denied Weidul's motion to suppress on January 19, 2012.[2]  It then granted a motion to continue filed by Weidul and rescheduled the jury trial to May 2012.  In February 2012, the court appointed another attorney— the fifth to be appointed—and ordered that Weidul be co-counsel with the three appointed attorneys to facilitate Weidul's participation in his defense.

[¶9]   Weidul, through counsel, moved in limine—without success—to exclude the testimony of the State Medical Examiner as unreliable.  Counsel also sought to obtain documents from Mercy Hospital, including the hospital's

---

[2]  In considering Weidul's appeal from the judgment of conviction, we concluded that, given the circumstances of the police interrogation, "the court did not err in concluding that [Weidul] knowingly, intelligently, and voluntarily waived his *Miranda* rights prior to making the incriminating statements, nor . . . in concluding that under the totality of the circumstances, Weidul made the statements voluntarily."  *State v. Weidul*, Mem-13-69 (June 20, 2013) (citations omitted).

6

report reviewing its practitioners' adherence to procedures and standards of care in treating the victim. After the court ordered Mercy to disclose its records, Mercy filed an interlocutory appeal to us, and we dismissed Mercy's appeal on May 16, 2012. *In re Motion for Prot. of Mercy Hosp. Evidence*, 2012 ME 66, 43 A.3d 965. The trial court ordered Mercy to produce the documents subject to a protective order, and Mercy did so two days before trial.

[¶10] The Mercy documents included a self-assessment of the hospital's treatment of the victim. The hospital concluded that its treatment fell below the standard of care because hospital staff failed to recognize the level of trauma inflicted on the victim. Specifically, the self-assessment noted that the victim "was not identified as a patient with a compromised airway," and that the hospital's policy was to require such patients to be admitted to the hospital's critical care unit. However, Weidul's counsel elected not to use the assessment at trial.

[¶11] The court held the jury trial over the course of eight days between May 18 and 30, 2012. The primary contested issue at trial was the cause of the victim's death. At trial, the State's medical examiner testified that the cause of death was respiratory arrest resulting from laryngeal edema, which occurred due to blunt trauma to the outside of the victim's neck. Weidul's counsel

cross-examined the medical examiner to demonstrate that she failed to include in her initial report that the victim had pneumonia at the time of his death, that she was not an expert regarding laryngeal edema being caused by neck trauma, that she had no significant source materials to support her finding as to cause of death, and that Mercy Hospital had treated the victim in a way that suggested that the hospital was not concerned about laryngeal edema.

[¶12]  Weidul's medical expert, Robert Belliveau, testified that he believed that undiagnosed pneumonia had caused the victim's death.  He testified that before learning of the pneumonia through viewing slides of tissue taken from the victim's lung, he had thought that the victim had died from laryngeal edema triggered by an allergic reaction to Zoloft combined with anesthesia.

[¶13]  The jury found Weidul guilty of all three charges.  On the manslaughter charge, the court sentenced Weidul to twenty years of incarceration with all but sixteen years suspended and four years of probation. The court sentenced him to a concurrent sentence of ten years of incarceration on the charge for aggravated assault and ordered him to pay a $250 fine for operating while his license was suspended or revoked.

[¶14]  Weidul appealed from the judgment of conviction, challenging the

denial of his motion to suppress his statements to police on the ground that he did not make the statements voluntarily. *See Weidul*, Mem-13-69. We affirmed the judgment of conviction on June 20, 2013. *See id.*

[¶15] Weidul filed a petition for post-conviction review on June 19, 2014. The court assigned counsel for Weidul. At Weidul's request, the court granted a continuance in 2015. In April 2016, Weidul filed an amended petition setting forth multiple allegations of ineffective assistance of counsel. At that time, Weidul's post-conviction counsel moved to withdraw on the ground that Weidul's behavior when they met at the Maine State Prison had made him fearful of Weidul. The court appointed new counsel for Weidul.

[¶16] After an additional continuance and a competency evaluation, the court denied another motion to continue filed by Weidul and began the post-conviction hearing on April 11, 2017. The court (*Wheeler, J.*) heard testimony from two of Weidul's trial counsel. Due to the court's unavailability, it did not hold its second day of the hearing until January 3, 2018, when the court took testimony from Weidul's third trial counsel. On the next hearing date—March 27, 2018—the court did not hear the matter because Weidul was not competent to proceed at that time. Justice Wheeler retired before the matter was concluded. On August 18, 2020, the matter was reassigned to

Chief Justice Mullen, and then, on June 18, 2021, it was reassigned to Justice Anderson. *See* M.R.U. Crim. P. 69A(b)(1), (c).

[¶17] The court (*Anderson, J.*) held the third and final day of the evidentiary hearing on June 8, 2022. The court heard testimony from Weidul on that day. Weidul objected to the court's decision to rely on the trial record and transcripts of the first two days of the hearing on post-conviction review rather than allowing Weidul to recall the attorney witnesses. Weidul asserted that it would be impossible for the court to assess credibility and weigh conflicting testimony without having heard the witnesses testify. The court overruled the objection, stating that it would allow the attorney witnesses to be recalled only to cover "[n]ew matters, new material." Weidul did not call the attorneys as witnesses.

[¶18] On November 28, 2022, the court entered a comprehensive order addressing Weidul's multiple contentions of ineffective assistance of counsel and denying post-conviction relief. The court found no ineffective assistance of counsel. It also found that Weidul failed to meet his burden of proving a reasonable probability—sufficient to undermine confidence in the outcome—that absent ineffective assistance of counsel, the result of the proceeding would have been different.

[¶19]   Weidul sought a certificate of probable cause authorizing an appeal.  *See* 15 M.R.S. § 2131(1) (2024); M.R. App. P. 2B(b)(1), 19(a)(2)(F), (c).  We issued a certificate of probable cause, and the matter is now before us on appeal.  *See* M.R. App. P. 19(f).

## II.  DISCUSSION

[¶20]   Weidul argues that the post-conviction court erred because it denied his petition based on the testimony of the three attorney witnesses without observing the testimony and was therefore unable to discern credibility and reliably find facts.  Weidul bases his argument on the absence of authority in the Maine Rules of Unified Criminal Procedure for one judge to succeed another in an ongoing evidentiary post-conviction proceeding without granting the parties leave to recall previous witnesses on any relevant issue.[3]

[¶21]   In reviewing a post-conviction court's decision on ineffective assistance of counsel, we "review a post-conviction court's legal conclusions de novo."  *Gordon v. State*, 2024 ME 7, ¶ 14, 308 A.3d 228 (quotation marks omitted).   Although we review for an abuse of discretion a court's determination of how to exercise the discretion conferred on it by rule when a judge becomes unable to proceed, *see* M.R.U. Crim. P. 25(a); *State v. Ruybal*,

---

[3] Because we agree with Weidul's contention, we do not consider Weidul's additional argument that the record did not support the post-conviction court's findings and conclusions.

408 A.2d 1284, 1287 (Me. 1979), we apply a de novo standard of review when interpreting the rule's language to determine the meaning of the rule and whether it must be applied, *State v. Johnson*, 2006 ME 35, ¶ 9, 894 A.2d 489.

## A.    The Limited Role of Successor Judges

[¶22]  The legal question here is whether, when some witnesses testified before the judge originally assigned in a post-conviction matter, a successor judge may render findings of fact and judgment on the petition without first allowing either party to recall those witnesses to testify before the successor judge on any disputed and material issue.  The following analysis leads us to conclude that the rules do not permit a successor judge to act to that extent unless the parties have affirmatively waived objection to the procedure.

[¶23]   Maine's post-conviction statute provides: "In all respects not covered by statute, the procedure in proceedings under this chapter is as the Supreme Judicial Court provides by rule."  15 M.R.S. § 2129(5) (2024).  Nothing in the statutes answers the specific question presented.  As to which set of rules applies, although post-conviction review has some civil attributes,[4] our rules of

---

[4]  Until 1980, post-conviction-review proceedings were deemed civil, with civil and criminal procedural rules, as applicable, governing practice.  *See Corey v. State*, 246 A.2d 201, 204 (Me. 1968); M.R. Crim. P. 35 Advisory Committee Note—1973; P.L. 1979, ch. 701, §§ 2, 15 (effective July 3, 1980) (repealing 14 M.R.S.A. § 5508 (Supp. 1979) in the civil procedure statutes and enacting chapter 305-A of Title 15 governing post-conviction review as part of the criminal procedure statutes).  In 1981, when the criminal rules were extensively revised, post-conviction proceedings became governed by the rules of criminal procedure.  *See* M.R. Crim. P. 65 Advisory Committee Note—1981.

criminal procedure have governed post-conviction proceedings since before 2014, when Weidul filed his petition. *See* M.R. Crim. P. 1(b)(1) (Tower 2014) ("These rules govern the procedure in the Superior Court and the District Court . . . [i]n all criminal proceedings, including appellate and post-conviction review proceedings . . . ."); *see also* M.R.U. Crim. P. 1(b)(1) (same).

[¶24] Rule 25(a) of the Maine Rules of Unified Criminal Procedure is the current source of authority in the criminal rules for a successor judge to act in a pending proceeding when a judge is unable to continue:

> If by reason of death, resignation, removal, sickness, or other disability, a judge before whom a defendant has been tried is unable to perform the duties to be performed by the court after a verdict or finding of guilt, any other judge assigned thereto by the Chief Justice of the Superior Court or the Chief Judge of the District Court may perform those duties; but if such other judge is satisfied that he or she cannot perform those duties because the judge did not preside at the trial or for any other reason, the judge may in the exercise of discretion grant a new trial.

M.R.U. Crim. P. 25(a). In 2014, what is now Rule 25(a) of the Maine Rules of Unified Criminal Procedure was codified as Rule 25 of the Maine Rules of Criminal Procedure. *See* M.R. Crim. P. 25 (Tower 2014). The only differences between the two are not substantive—the former rule used the term "justice or

---

Even so, post-conviction review was understood as a proceeding that was "essentially *sui generis*, embodying heterogeneous features that defy pro forma application of the label 'civil' and 'criminal.'" *Id.*

judge" whereas the current rule refers only to "judge" and includes a footnote describing the scope of that term. Because which version applies makes no difference, we apply the current Rule 25(a).[5]

[¶25] The rule permits a successor judge to perform "the duties to be performed by the court after a verdict or finding of guilt," so it cannot be construed to permit a successor judge to take another judge's place during the testimonial phase of a criminal trial.[6] This limitation is consistent with other jurisdictions' prohibition of the substitution of a judge when a criminal bench trial is underway. *See* 6 Wayne R. LaFave, *Criminal Procedure* § 22.4(e) at 203 n.73 (4th ed. 2015) (listing jurisdictions). The American Bar Association Standards for Criminal Justice include commentary stating, "In a bench trial,

---

[5] Rule 1 of the Maine Rules of Unified Criminal Procedure provides that the Rules apply in actions (including post-conviction proceedings) pending at the time the rules took effect in 2015, unless "in the opinion of the court their application in a particular action pending when they take effect would not be feasible or would work an injustice, in which event the Maine Rules of Criminal Procedure apply." M.R.U. Crim. P. 1(b); *see* M.R.U. Crim. P. 1(e) (specifying effective dates).

[6] We recognize the authority of successor judges who did not sit in the original criminal trials to decide post-judgment motions. For example, in *State v. Ruybal*, 408 A.2d 1284, 1286-87 (Me. 1979), we upheld the denial of two defendants' motions for a new trial entered by a successor judge who relied on the record and transcripts from the trial. We discerned no abuse of discretion in the successor judge ruling on motions for a new trial based on newly discovered evidence when five years had passed since trial and the originally assigned judge would also have had to rely on the record more than on the judge's memory of the events. *See id.* at 1287. We noted that demeanor is not always a crucial determinant of credibility—a reality that a court may consider in its ruling. *Id.* ("The justice could correctly have concluded that although the *credibility* of the witness . . . was at issue, an evaluation of his *demeanor* at trial would play no part whatever in the determination of the new trial motions."). That conclusion, however, does not carry over to the court's task of finding facts based on disputed witness testimony, which necessarily encompasses its assessment of witness credibility through the perception of witness demeanor and tone of voice.

mid-trial substitution is inappropriate because the new judge would not have had the opportunity to judge the credibility of the witnesses, nor to have heard the testimony in detail." ABA Standards for Crim. Just.: Discovery & Trial by Jury § 15-3.3, at 193 (3d ed. 1996).

[¶26]  There is no counterpart to Rule 25(a) in our rules for post-conviction proceedings, however, and post-conviction proceedings do not fit precisely into the framework established by Rule 25(a): there is no "verdict or finding of guilt" in a post-conviction proceeding. Still, no rule of criminal procedure other than Rule 25(a) addresses the extent to which one judge may succeed another in a pending proceeding. Even if we were to look to the civil rules or to common law, we would find that they, too, incorporate the principle that a successor judge who has not presided during all of the witness testimony at a bench trial must either grant a new trial or at least allow the parties to recall witnesses whose testimony is material and disputed. *See* M.R. Civ. P. 63(a) ("In a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden."); *McKenney v. Wood*, 108 Me. 335, 336-38, 80 A. 837, 838-39 (1911) (requiring a successor judge to

grant a new trial in equity unless the parties consent to the entry of a decree).[7]

[¶27]  Weidul assumes that Rule 25(a) of the Maine Rules of Unified Criminal Procedure is applicable and contends that it must be construed to limit the participation of successor post-conviction judges to the same extent that it expressly limits the participation of successor judges in original criminal proceedings.  We agree.  Although post-conviction review necessarily comes "after a verdict or finding of guilt" in the preceding criminal matter, Rule 25(a)

---

[7] In *McKenney v. Wood,* we held that equity forbade a successor judge from rendering a decree in equity without consent of the parties if the decree would be based on testimony presented to a different judge:

> Under this Rule only the Justice who heard the case can settle and sign the decree, except by consent.  And justice, as well as the letter of the Rule, requires this interpretation.  If such is not the Rule, it ought to be.  Since the enactment of section 9 of chapter 68 of the Laws of 1881, it has been permissible, contrary to the ancient practice in equity, to take out the evidence in whole or in part, orally in the presence of the court, and not wholly by depositions.  In fact, according to the present practice, nearly all of the testimony of witnesses is oral.  The conclusions of the Justice hearing the cause may depend, and frequently do depend, not only upon the words of the witness, but upon his manner.  The words can be reproduced afterwards, the manner cannot.  As was said in *Young v. Witham*, 75 [Me.] 536[, 537 (Me. 1884)]: "When the testimony is conflicting, the Judge has an opportunity to form an opinion of the credibility of witnesses not afforded to the full court.  Often there are things passing before the eye of a trial judge that are not capable of being preserved in the record.  A witness may appear badly on the stand and well in the record."  The same observations apply to the case of one Justice who is called upon to settle a decree upon evidence taken out before another.  He certainly is not bound by the conclusions of the Justice who heard the case, even if they have been expressed.  The decree is his own judicial act, and must express his own conclusions.  He cannot properly have any conclusions, except after hearing the case anew upon the record.  But so far as the facts are concerned, the record, after all, is only a part of the case.  Therefore it is that the Rule provides that the Justice who heard the case must settle and sign the decree. There are no exceptions.  Fair dealing to the litigants will not permit any.

108 Me. 335, 337, 80 A. 837, 838-39 (1911).

cannot rationally be interpreted to allow unlimited activity by a successor judge in a subsequent but different proceeding regarding a convicted person. Otherwise there would be no limit on a successor judge's participation in a post-conviction proceeding or on how many different judges could preside during the course of a single post-conviction-review hearing.  We decline to construe Rule 25(a) to permit a judge who has not heard all the testimony in a post-conviction hearing to finish the hearing and render factual findings and judgment without allowing witnesses to be recalled on any relevant topic, unless the parties consent.  Because Weidul did not consent and was not permitted to recall the three attorney witnesses except for examination on topics not addressed previously, we conclude that the court erred.  Our analysis now turns to whether the error was harmless.

## B.    Harmless Error

[¶28]    In an original criminal proceeding and a post-conviction proceeding, we can pronounce an error harmless when we can affirmatively conclude that the error did not result in substantial injustice or affect substantial rights, M.R.U. Crim. P. 52(a), or if we can say that it is "'highly probable that the error did not affect the judgment,'" *Petgrave v. State,* 2019 ME 72, ¶ 32, 208 A.3d 371 (Alexander, J., concurring) (quoting *State v.*

*Guyette*, 2012 ME 9, ¶ 19, 36 A.3d 916); *see Wark v. State*, 266 A.2d 62, 63 (Me. 1970).[8]  To assess the probability that the error did not affect the judgment, we focus primarily on the materiality to the judgment of the testimony that the successor judge did not observe and hear, and the extent to which the testimony was disputed.  *See State v. Burdick*, 2001 ME 143, ¶ 32, 782 A.2d 319; *State v. Mihill*, 299 A.2d 557, 559 (Me. 1973).

[¶29]  The determination of materiality must begin with the legal standards that governed Weidul's petition.  To prevail, he had to prove "(1) that counsel's representation fell below an objective standard of reasonableness and (2) that the errors of counsel actually had an adverse effect on the defense." *Ford v. State*, 2019 ME 47, ¶ 11, 205 A.3d 896 (alteration and quotation marks omitted).[9]  "In determining whether the petitioner has met his burden on the

---

[8]  We apply a stricter harmless error standard when the error under review is a violation of a constitutional right.  *See Judkins v. State*, 2024 ME 45, ¶¶ 20, 22, --- A.3d --- (indicating that, for an error of constitutional dimension to be harmless, we must be confident beyond a reasonable doubt that the error did not contribute to the outcome).  Weidul does not contend that the court's error violated his constitutional rights.

[9]  Representation "falls below the objective standard of reasonableness if it falls below what might be expected from an ordinary fallible attorney."  *Hodgdon v. State*, 2021 ME 22, ¶ 12, 249 A.3d 132 (quotation marks omitted).  Although there is a "presumption that, under the circumstances, the challenged action might be considered sound trial strategy, a determination that defense counsel's choices amount to trial strategy does not automatically insulate them from review."  *Id.* (alteration, citation, and quotation marks omitted).  "We . . . review any questions involving strategy to determine whether such strategy was manifestly unreasonable, that is, the strategy resulted in a loss of a substantial ground of defense."  *Doucette v. State*, 463 A.2d 741, 747 (Me. 1983).  "[A] determination whether any given action or omission by counsel amounted to ineffective assistance cannot be divorced from consideration of the peculiar facts and circumstances that influenced counsel's judgment."  *Tribou v. State*, 552 A.2d 1262, 1264 (Me. 1989) (quotation marks omitted).

performance prong of this test—that counsel's representation was deficient—a court affords trial counsel's strategic decisions significant deference." *Hodgdon v. State*, 2021 ME 22, ¶ 12, 249 A.3d 132. Under the second prong, to establish prejudice and demonstrate that counsel's errors had an adverse effect on the defense, "a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Winchester v. State*, 2023 ME 23, ¶ 7, 291 A.3d 707 (alteration and quotation marks omitted).

[¶30] Weidul contended (and maintains on appeal) that his counsel were ineffective in part because they failed to explore and develop facts and theories that could have raised reasonable doubt as to his guilt. For example, he wanted his counsel to arrange for testing of some of the blood and uprooted hair found in the victim's apartment to support his claim of self-defense. Similarly, Weidul claimed that once his attorneys learned that the hospital that admitted the victim had investigated and reviewed its own care and determined that its staff's failure to identify and address the victim's blocked airway could have contributed to his death, his attorneys were ineffective in failing to use the

results of the investigation to raise reasonable doubt as to the cause of the victim's death. Weidul also contended that his trial counsel should have retained as an expert witness an otolaryngologist whose expertise focused on conditions of the larynx, including laryngeal edema, to refute the medical examiner's theory as to the cause of death.

[¶31] The court had to consider the credibility of the attorneys' testimony in response to Weidul's contentions. For instance, it had to determine whether the attorneys, after receiving the hospital's report admitting that it had failed to identify the victim "as a patient with a compromised airway," testified credibly that it was a reasonable tactical choice, not an omission or misjudgment, that led counsel not to seek a continuance of the trial or to use the report during the trial to investigate whether any gross negligence of the medical providers constituted an intervening cause of the victim's death. *See State v. Limary*, 2020 ME 83, ¶¶ 31-39, 235 A.3d 860 (affirming a judgment of conviction when "the jury could rationally find beyond a reasonable doubt that (1) the victim's death would not have occurred but for the conduct of the defendant, operating either alone or concurrently with another cause; and (2) the medical care was not clearly sufficient, and the [defendant's conduct] was not clearly insufficient, to cause the victim's death"

(quotation marks omitted)).

[¶32] Similarly, the court's findings about whether counsel acted below the standard of an ordinary fallible attorney in deciding not to test the blood and hair samples or call an otolaryngologist to rebut the medical examiner's testimony depended on the credibility of counsel's testimony.

[¶33] All of the attorneys' testimony on these and other issues was both disputed by Weidul and material under the applicable legal standards. The court, in its findings, credited the testimony of Weidul's trial counsel in full as to each claimed instance of ineffective performance by his attorneys. Thus, the court's decision to deny Weidul's petition depended on the court's evaluation of the credibility of testimony that the court did not observe. *See Hodgdon*, 2021 ME 22, ¶ 12, 249 A.3d 132 (summarizing the findings required to determine whether a petitioner received ineffective assistance from counsel). The direct observation of live testimony can be integral to a fact finder's function in assessing the credibility of disputed evidence. *See Lewisohn v. State*, 433 A.2d 351, 355 (Me. 1981) (indicating that a court considering a post-conviction matter has "a unique opportunity to observe the demeanor of the witness on the stand and to take account of those important testimonial subtleties" that are inaccessible when "reviewing a cold transcript"). "The

weight to be given the testimony of any witness is in large measure a reflection of the impressions gained by the factfinder" regarding the witness's sincerity, memory, and capacity for self-expression. *Id.* Although attorneys have an ethical obligation to be truthful as officers of the court, *see* M.R. Prof. Conduct 8.4(c), (d), the credibility of an attorney's testimony must be evaluated for its weight and credibility to the same extent as the testimony of any other witness.

[¶34] There is also the question of whether we should accord the court's determinations of witness credibility the deference reflected in the "clear error" standard of review when the court did not observe the witness testimony at issue. The "clear error" standard that we apply to a trial court's findings of fact regarding disputed witness testimony is based in part on the trial court's superior ability to "observe[] the witnesses and weigh[] their credibility." *State v. McCarthy,* 2003 ME 40, ¶ 11, 819 A.2d 335 (discussing appellate review of factual findings underlying a denial of a motion to suppress).[10]

---

[10] To be sure, the clear error standard that we apply to a trial court's findings of fact is not solely a function of the court's ability to observe witness testimony; the same standard applies even when the findings are based on a record consisting of documentary evidence rather than witness testimony. *See Estate of Tully*, 545 A.2d 1275, 1278 (Me. 1988) (citing *Cushing v. State*, 434 A.2d 486, 494 (Me. 1981) ("The fact that the record consists of documentary evidence does not entitle the parties to a trial *de novo* on appellate review.")). "[T]he proper role of an appellate court require[s] that one court, the trial court, have the fact-finding role and that the appellate court defer to the trial

22

[¶35]  Given that the court's findings regarding the attorneys' credibility go to the heart of Weidul's claims of ineffective assistance, we cannot conclude that it is highly probable that the court's inability to assess witness demeanor, tone of voice, body language, and the other elements that can go into assessing credibility did not affect the judgment.  *See* M.R.U. Crim. P. 52(a); *cf. Wark*, 266 A.2d at 63 ("Post-conviction relief from custody will not be afforded upon a showing of mere harmless and non-prejudicial clerical errors.").  We therefore vacate the judgment and remand for further proceedings on Weidul's petition.

The entry is:

> Judgment vacated.  Remanded for further proceedings consistent with this opinion.

---

Donald S. Hornblower, Esq. (orally), Lewiston, for appellant Ernest B. Weidul

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2014-4224
FOR CLERK REFERENCE ONLY

---

court's findings."  *Tully,* 545 A.2d at 1277-78 (quotation marks omitted).  Here, the record consisted of witness testimony in addition to documentary exhibits.